## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**KYLE E. WELSH,**

       **Plaintiff,**

                                             **Civil Action 2:19-cv-5141**
                                             **Judge Michael H. Watson**
       **v.**                                     **Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

### REPORT AND RECOMMENDATION

Plaintiff, Kyle E. Welsh ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for

review of a final decision of the Commissioner of Social Security ("Commissioner") denying his

application for supplemental security income benefits.  This matter is before the United States

Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No.

10), the Commissioner's Memorandum in Opposition (ECF No. 15), Plaintiff's Reply to the

Opposition (ECF No. 16), and the administrative record (ECF No. 9).  For the following reasons,

it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and

**AFFIRM** the Commissioner's decision.

### I.  BACKGROUND

Plaintiff applied for childhood disability benefits on August 20, 2015, alleging disability

beginning December 8, 1997.  (R. at 277-280.)  Plaintiff's claim was denied initially and upon

reconsideration.  (R. at 136-146, 160-170.)  Upon request, a hearing was held on January 5,

2018, in which Plaintiff, proceeding with the assistance of his father but without the assistance of

counsel,[1] appeared and testified.  (R. at 97-135.)  A vocational expert ("VE"), Teresa Trent, also appeared and testified at the hearing.  (*Id*.)  On August 30, 2018, Administrative Law Judge Kristen King ("the ALJ") issued a decision finding that Plaintiff was not disabled.  (R. at 80–91.)  On September 24, 2019, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1–4.)  Plaintiff then timely commenced the instant action.  (ECF No. 1.)

## II.  RELEVANT HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified at the January 2018 administrative hearing that he graduated from Marietta High School in 2015.  (R. at 109-110.)  Plaintiff testified that he played on the football and basketball teams, that he got along with his coaches and teammates, and that he loved playing.  (R. at 133.)  Plaintiff testified he got his driver's license at age 18, and that he drives a couple of days on a weekly or monthly basis, including to go to stores or grocery shopping.  (R. at 111.)  Plaintiff testified that he does not have any problems handling cash or paying for purchases, including when he makes cash purchases.  (R. at 111-112.)  Plaintiff testified that he has a cell phone, and that he uses his cell phone for the internet and to text his friends.  (R. at 112-113.)  Plaintiff testified that he goes deer hunting with his friends.  (R. at 114.)

Plaintiff testified that he believes he is unable to work because he "[j]ust [doesn't] think [he] can do it."  (*Id*.)  Plaintiff testified that it is hard for him to follow instructions at work, so when someone tells him to do something at work, he can't get it right.  (*Id*.)  Plaintiff testified

---

[1] At the outset of the January 2018 administrative hearing, the ALJ advised Plaintiff and Plaintiff's father that Plaintiff had the right to be represented by an attorney or other qualified person of Plaintiff's choice, and that a representative might be able to help Plaintiff find additional evidence, examine witnesses, and submit arguments.  (R. at 100-101.)  After being so advised, Plaintiff waived his right to counsel.  (R. at 101-102.)

that a week prior to the administrative hearing, he was employed part-time to clean tools and equipment.  (*Id.*)  Plaintiff testified he had worked approximately 30 hours for that job, but he would not continue because the employer wanted him to get a commercial driver's license in order to continue working there.  (R. at 115.)  Plaintiff also testified that he previously had held a job for one day, for a company named Black Tree Service.  (*Id.*)  Plaintiff testified that he only worked for one day at that job because other workers were making fun of him for not doing things right or for not working quickly enough.  (R. at 115-116.)  Plaintiff testified that he previously also had a landscaping job, but that job ended after about a week because Plaintiff could not keep up with the fast pace.  (R. at 116.)

Plaintiff testified that he currently takes medications, including Lexapro, and that the medications help his mood because Plaintiff is "not hiding from people" and is able to spend time with people and bond with them.  (R. at 118.)  Plaintiff testified that he spends time with people watching football, going out, and hunting, but at the same time he doesn't think he is ready to work.  (R. at 118-119.)  Plaintiff stated that he likes to do nursing or welding, and he has looked at what training may be required for a welding career.  (R. at 119.)  Plaintiff testified that he gets anxious about what people say, and about being around people, but he is not really sure if he has any symptoms of depression.  (R. at 119-120.)  Plaintiff stated that he has nightmares related to his past trauma, approximately seven days out of thirty.  (R. at 120-121.)

**B.  Plaintiff's Father's Testimony**

Plaintiff's father, Wilbur T. Welsh, Jr. ("Mr. Welsh"), testified as a witness at the administrative hearing.  (R. at 121-127.)  Mr. Welsh testified, and the ALJ stipulated, that Plaintiff had a trauma when he was about four or five years old.  (R. at 108-109.)  Mr. Welsh testified that the people Plaintiff works around "usually pick up real quickly on his limitations

3

and tease him pretty cruelly," which causes anxiety and related problems.  (R. at 121.)  Mr. Welsh stated that Plaintiff is a very willing young man, but there are certain things that could trigger some of his anxiety and panic.  (R. at 121-122.)  Mr. Welsh stated Plaintiff's triggers are unpredictable, as they could be smells, colors, words, or "just about anything."  (R. at 122.)  Mr. Welsh testified that he notices improvements when Plaintiff takes his medications, including that Plaintiff no long has "flareups" with his parents like he used to, and that Plaintiff "is more interactive with the family when people come to visit and things."  (R. at 124.)  Mr. Welsh testified that Plaintiff has no physical limitations.  (R. at 126.)

Mr. Welsh testified that he believed Plaintiff's most recent job "was a good fit for him," and if the company hadn't required Plaintiff to obtain a commercial driver's license, Mr. Welsh "think[s] [Plaintiff] could have succeeded."  (R. at 122.)  Mr. Welsh also testified that they previously had looked at vocational services to try to place Plaintiff with employment, and Plaintiff received a summer job in 2014 as a result.  (R. at 124-125.)

## C.     Vocational Expert's Testimony

Teresa Trent testified as the VE at the administrative hearing.  (R. at 128-132.)  Based on Plaintiff's age, education, and work experience and the residual functional capacity ultimately determined by the ALJ, the VE testified that a similarly situated hypothetical individual could perform the following jobs that exist in significant numbers in the national economy:  packager, laundry laborer, sorter, assembler, routing clerk, marking clerk, and inspector.  (R. at 130-131.)

## III.  RELEVANT RECORD EVIDENCE

## A.     School Records

On November 10, 2014, Plaintiff and his parents met with representatives of the Marietta School District for an Annual Review of Plaintiff's Individualized Education Program ("IEP"),

which would be effective from November 10, 2014 until May 29, 2015.  (R. at 358-370.)  At that

time, Plaintiff was a Senior in high school, and planned to go to the Washington County Career

Center in the fall to work on certification in a heavy equipment program.  (R. at 359.)  The IEP

indicated that Plaintiff "is very friendly and polite" and that he had "mature[d] over the past three

years."  (*Id.*)  The IEP stated that Plaintiff "seems more sure of himself," but "does need to try

harder in class," because "[h]e tends to hurry through his work, never asks questions, and does

not study for tests."  (*Id.*)  The IEP also stated that Plaintiff "is still easily influenced and

decision making and problem solving are very difficult for him."  (*Id.*)

The IEP reported Plaintiff's scores from a WIAT III test given in the fall of 2011,

including a 70 (borderline impaired) for math calculations; a 67 (mildly impaired) for math

reasoning; a 77 (borderline impaired) for reading recognition; a 73 (borderline impaired) on

reading comprehension; and an 81 (low average) on the writing section of the test.  (*Id.*)  The IEP

commented that Plaintiff "is taking a business math class which consists of math skills he will

need for life: using money and making change, telling time, and shopping for groceries and

personal needs."  (*Id.*)

The IEP indicated that Plaintiff "needs skills to prepare him for independent adult life,"

and he "needs skills to become the most self-sufficient he can be."  (R. at 360.)  The IEP rated

Plaintiff on the Employability/Life Skills Assessment, and reports that he scored lowest in

"recognizing and correcting mistakes, and seeking help when needed."  (*Id.*)  By contrast,

Plaintiff's highest scores were in using appropriate manners, good grooming, respecting another

person's property, and having a positive relationship to a supervisor/teacher.  (*Id.*)  The IEP also

reported Plaintiff's level of academic achievement and functional performance for reading,

stating that Plaintiff scored at approximately a fourth-grade level for reading vocabulary, reading

comprehension, and total reading.  (R. at 362.)  The IEP noted that Plaintiff "has improved on

this test this year which is very positive."  (*Id.*)  The IEP also reported that Plaintiff "has been

learning to tell time," that he "can tell time using a face clock" and that he "is also able to count

forward when minutes are needed to find a later time."  (R. at 364.)  The IEP stated that "[w]hen

starting this task, he had difficulty grasping the concept" but "[n]ow he understands and can tell

time."  (*Id.*)  The IEP concluded that "[b]ecause of [Plaintiff's] academic ability, he needs to

have the opportunity that can be provided to him through a special education classroom.  His

skills are below peers his age and need to be addressed in an environment where there is a

chance of optimal success."  (R. at 367.)

Plaintiff graduated from Marietta High School on May 24, 2015, with a class rank of 124

out of 220.  (R. at 512.)

**B.     Memorial Health Center**

On October 28, 2014, Plaintiff underwent a physical at Memorial Health Center.  (R. at

352-354.)  Mr. Welsh reported to Plaintiff's doctor that Plaintiff's "school performance has been

satisfactory," and Plaintiff indicated that he "wants to be a heavy equipment mechanic."  (R. at

353.)  Plaintiff's doctor described Plaintiff as an "[a]thletic teenager in no apparent distress

appearing slightly anxious for the first encounter."  (R. at 354.)

Plaintiff began seeing his primary care physician, Dr. Eva Giro, on August 29, 2016.  (R.

at 382-386.)  In his first appointment with Dr. Giro, Plaintiff complained of anxiety and a

depressed mood, and Dr. Giro noted Plaintiff's traumatic infancy and early childhood.  (R. at

382-384.)  Dr. Giro noted that Plaintiff "has [a] learning disability," and noted that "[h]e required

help with subjects at school" but "[h]e eventually graduated from Marietta High School in

2015."  (R. at 384.)  Dr. Giro stated that Plaintiff "does not have a steady source of income," and

highlighted that he "mows grass for people in the summer but has not been able to hold a steady job." (*Id.*)  Dr. Giro added that Plaintiff "tried working for [a] construction company that replaces gutters but only lasted one day" because "[a]pparently he was put to work with an ex-prisoner and became extremely anxious by that." (*Id.*)  Dr. Giro also highlighted that Plaintiff "volunteers for the local fire department," has "a few good friends that he likes to spend time with," and "[h]is family is supportive." (*Id.*)

Dr. Giro indicated that Plaintiff "complains of low mood, easy irritability, [and] being afraid of strangers," sometimes to the point that Plaintiff would feel sick and vomit. (*Id.*) Plaintiff's parents reported to Dr. Giro that Plaintiff has "problems with making decisions and following through with his decisions," and Plaintiff's mother stated that Plaintiff is "incapable of doing anything outside his comfort zone." (*Id.*)  Plaintiff reported having had thoughts of lethality in the past, but not recently. (*Id.*)  Dr. Giro assessed Plaintiff with Post Traumatic Stress Disorder, anxiety, depression, and a learning disability, and prescribed Plaintiff with Lexapro. Dr. Giro referred Plaintiff to psychiatric treatment, and noted that Plaintiff "[w]ill need eval[uation] for disability" given his trouble finding a job. (R. at 385-386.)

On September 12, 2016, Dr. Giro noted that Plaintiff could be referred to a psychologist. (R. at 380.)  On September 29, 2016, Plaintiff returned to Dr. Giro for a medication check. (R. at 376-379.)  Plaintiff reported "marked improvement" in his mood with Lexapro, and Mr. Welsh "confirm[ed] that [Plaintiff] has been less irritable, more social and has been enjoying others' company more" since starting the medication. (R. at 377.)  Dr. Giro noted that Plaintiff "still volunteers for [the] local Fire Dept." (*Id.*)  Dr. Giro refilled Plaintiff's prescription for Lexapro and noted that Plaintiff would soon begin counseling at Hopewell Health Center. (R. at 379.)

Plaintiff returned to Dr. Giro two more times, on August 28, 2017 and on September 28, 2017.  (R. at 445-455.)  In each visit, Plaintiff stated he was doing well and would like to continue his medication, and Dr. Giro refilled Plaintiff's prescription for Lexapro and ordered him to continue counseling at Hopewell Health Center.  (*Id.*)

**C.    Hopewell Health Center**

From October 3, 2016 through February 23, 2018, Plaintiff regularly received counseling at Hopewell Health Center.  (R. at 407-443, 456-467, 544-555.)  Treatment records indicate Plaintiff was assessed with "Chronic PTSD; [reports of] Major Depressive Disorder."  (*Id.*)  At Plaintiff's first appointment on October 3, 2016, Plaintiff stated that he was referred to counseling to get "some help with mood issues" because he "doesn't like being around people," symptoms he had been experiencing ever since his trauma.  (R. at 436-437.)  Plaintiff reported enjoying growing up in his home, and stated that he had good relationships with his family members.  (R. at 440-441.)  Plaintiff stated he was unemployed and seeking work through a local organization.  (R. at 441.)  Plaintiff discussed his previous job in landscaping, stating that it ended "because of teasing and stress finishing up high school."  (R. at 441.)  Plaintiff stated he had never been fired or asked to resign from a job.  (*Id.*)  Helen Farrah-McGrail, LISW, the intake provider, noted that Plaintiff had "[d]epressive and anxiety [s]ymptoms," recommended counseling two to four times per month, and indicated that Plaintiff "[m]ay need help applying for benefits or finding good employment."  (R. at 442-443.)

From October 10, 2016 through November 21, 2016, Plaintiff saw Adryanne A. Garrett, LISW-S, approximately once a week.  (R. at 419-435.)  Ms. Garrett consistently reported that Plaintiff was making "good progress" over the course of these sessions.  (*Id.*)  On November 3, 2016, Ms. Garrett indicated that Plaintiff "has a mild learning impairment which causes paranoia

and anxiety on the job," and he "needs assistance with job searching and [his] disability application." (R. at 426.) By November 21, 2016, Ms. Garrett noted that Plaintiff was "[b]egin[ning] the process of setting up goals for what [Plaintiff] wants his life to look like." (R. at 419.) From December 12, 2016 through February 2, 2017, Plaintiff returned to Ms. Garrett once per month, and Ms. Garrett reported "Good Progress" and "Some Progress" from these sessions. (R. at 413-418.)

Plaintiff returned to Ms. Garrett on June 12, 2017. (R. at 411-412.) Plaintiff then began a new course of counseling, approximately every two weeks until July 13, 2017, and then with Lamar Dowling, MSW, LSW, from July 27, 2017 through February 23, 2018. (R. at 407-412, 456-467, 544-555.) Ms. Garrett noted working with Plaintiff "about taking steps toward furthering goal oriented work," and she reported "Good Progress" and "Some Progress" with Plaintiff. (R. at 407-412.) Mr. Dowling reported "Some Progress" from his sessions with Plaintiff. (R. at 456-467, 544-555.) On October 13, 2017, Mr. Dowling noted that Plaintiff "reports that he hopes to be starting a new job soon and he is very excited about it." (R. at 458.) Mr. Dowling helped Plaintiff develop techniques to combat anxious feelings, and in January 2018, Plaintiff began taking steps toward joining a martial arts club "to help him vent his aggression and anger in a safe and healthy way." (R. at 549-552.) In February 2018, Plaintiff reported to Mr. Dowling that "he has not had nightmares and has had fewer angry outbursts since learning and utilizing those skills." (R. at 547-549.)

### D. Amynda Rhodes, Psy.D.

On January 27, 2014, while Plaintiff was in the eleventh grade, Plaintiff was examined by Amynda Rhodes, Psy.D., upon referral by the Ohio Division of Disability Determination for evaluation of the presence or absence of a mental disorder, and for evaluation of any resulting

limitations in mental activities required to work. (R. at 568-575.) Dr. Rhodes interviewed

Plaintiff, reviewed psychological testing, reviewed Plaintiff's background information, and

reviewed Plaintiff's IEP. (R. at 568-569.)

According to Dr. Rhodes, "[w]hen asked as to the nature of his disability, [Plaintiff]

responded, 'I don't know.'" (R. at 569.) Plaintiff's father stated that Plaintiff had been enrolled

in special education courses, and he was concerned that Plaintiff would not be able to find a job.

(*Id.*) Dr. Rhodes reported Plaintiff's IEP and highlighted that "[h]is IEP report indicates that

[Plaintiff] is a likeable person in school and does not mention any behavioral problems." (*Id.*)

Dr. Rhodes noted that Plaintiff had not worked any formal jobs, but he had held summer jobs

which he reported to enjoy. (R. at 570.) Dr. Rhodes acknowledged Plaintiff's childhood trauma,

and commented that Plaintiff did not discuss any related issues during the evaluation. (*Id.*)

As to Dr. Rhodes' evaluation of Plaintiff's mental status, she found "no evidence of any

mood difficulties," "[n]o evidence of an anxiety disorder is present at this time," and "[n]o

evidence of a formal thought disorder or psychosis was noted." (R. at 571.) Dr. Rhodes found

that Plaintiff's "phraseology, grammatical structure, and vocabulary suggested that he was of low

average intelligence," "[h]is attention and concentration skills were marginally adequate," "[h]is

arithmetic skills were low," and "[h]is abstract reasoning skills were marginally adequate." (R.

at 571-572.) Dr. Rhodes found that Plaintiff's "judgment did not appear to be sufficient for him

to make decisions affecting his future and to conduct his own living arrangement efficiently due

to his cognitive level, lack of independence / experience, and young age. He would likely need

assistance managing funds if awarded disability." (R. at 572.)

Dr. Rhodes also reported Plaintiff's scores on the Wechsler Adult Intelligence Scale –

Fourth Edition, noting that Plaintiff obtained a Verbal Comprehension Index of 70, a Perceptual

Reasoning Index of 65, and a Full Scale IQ of 63, which indicated that he was functioning in the very low range, or at the 1st percentile for his age group.  (*Id.*)  Dr. Rhodes also noted that Plaintiff's memory index of 66 indicates that his attention and concentration skills are in the very low range, or at the 1st percentile for his age group, and Plaintiff's processing speed index of 76 indicates that his ability to efficiently process information is in the borderline range, or at the 5th percentile for his age group.  (*Id.*)

Dr. Rhodes wrote that Plaintiff's test data suggests that his language-based reasoning skills were in the low borderline range, while his non-verbal reasoning skills fell in the very low range.  (R. at 572.)  Dr. Rhodes added that "[t]he results appear[] to be a valid indicator of true functioning, as scores mimic ranges that are indicated on his IEP."  (R. at 573.)  Dr. Rhodes noted that Plaintiff's scores suggest that his reading, sentence comprehension, and spelling abilities were comparable to a fourth grade student, while his math computation abilities were comparable to a second grade student, again adding that "[t]hese scores appear to be a valid indicator of true functioning, as they are commensurate with scores indicated on his IEP."  (*Id.*)

In conclusion, Dr. Rhodes found that Plaintiff has "some learning difficulties that are evident by his IEP and confirmed through current cognitive testing, which indicates he functions in the borderline range of intelligence."  (R. at 573.)  Dr. Rhodes diagnosed Plaintiff with a "Mild Intellectual Disability."  (R. at 574.)  She added that Plaintiff "was cooperative, polite, and a likeable young man," and that he "did not appear to exaggerate or minimize his difficulties." (*Id.*)  Dr. Rhodes commented that Plaintiff "is able to perform simple instructions but may have difficulty with multistep tasks."  (*Id.*)  Finally, Dr. Rhodes noted that Plaintiff "did not appear easily frustrated," but rather "[h]is demeanor was easy-going," but "stress and pressure may slow down his ability to process information or accurately perform on a job."  (R. at 575.)

### E.   State Agency Consultants

State Agency psychologist Paul Tangerman, Ph.D., reviewed Plaintiff's file on October 7, 2015, and found that Plaintiff had moderate restrictions in his activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation.  (R. at 141.)  Dr. Tangerman found that Plaintiff's statements were fully credible and consistent with the objective findings from his examination.  (*Id.*)  Dr. Tangerman reviewed Dr. Rhodes' opinion and afforded it "great weight," noting that "her opinions are consistent [with] the evidence as a whole."  (R. at 142.)  Dr. Tangerman also conducted a Residual Functional Capacity assessment, concluding that Plaintiff "does retain the capacity to understand, remember, an[d] carry out very simple instructions, perhaps [with] some supervisory support"; "does retain the capacity to perform very simple, routine, and repetitive tasks [with] some supervisor support that doesn't require working in groups or high productions demands"; "does retain the capacity for [occasional] and superficial interaction in the work setting"; and "retains the capacity to adjust to minor and infrequent changes in the work setting [with] supervisory support."  (R. at 142-144.)  Dr. Tangerman noted that Plaintiff "is reportedly extremely sensitive about his limited abilities and will sometimes withdraw"; "has trouble [with] criticism and has a fear of failing" but "does respect authority figures and is described as very friendly and polite"; and "would likely have trouble adapting to work situations" because "[h]e is easily frustrated and doesn't handle change or pressure well" and "is easily influenced."  (R. at 143-144.)  Dr. Tangerman ultimately concluded that Plaintiff was "Not Disabled," with the following explanation:

> You said you were disabled due to a learning disability. Medical evidence does show that your condition results in some limitations. However, you are still able to communicate effectively with others and understand, remember, and carry out simple instructions on a regular basis. We realize that your condition causes

12

> difficulties, yet, it does not significantly interfere with your ability to perform all
> work related activities. We considered the medical and other information, your age
> and education in determining how your condition affects your ability to work. We
> do not have sufficient vocational information to determine whether you can perform
> any of your past relevant work.

(R. at 146.)

State Agency psychologist Karla Voynten, Ph.D., reviewed Plaintiff's file at the

reconsideration level on March 14, 2016, and agreed with all of Dr. Tangerman's assessments.

(R. at 160-170.) Dr. Voynten also concluded that Plaintiff was "Not Disabled," and provided

following explanation:

> You said you were disabled due to a learning disability. The medical evidence
> shows that your condition does limit the complexity of tasks that you can
> complete and the types of environments that you can work in. However, your conditions are
> not so severe as to prevent you from working all jobs. We do not have sufficient
> vocational information to determine whether you can perform any of your past
> relevant work. However, based on the evidence in file, we have determined that
> you can adjust to other work.

(R. at 169.)

## IV. ADMINISTRATIVE DECISION

On August 30, 2018, the ALJ issued her decision. (R. at 80-91.) At step one of the

sequential evaluation process,[2] the ALJ found that Plaintiff has not engaged in any disqualifying

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the
criteria of an impairment set forth in the Commissioner's Listing of Impairments,
20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant
perform his or her past relevant work?

substantial gainful activity since December 8, 1997. (R. at 83.) At step two, the ALJ found that

Plaintiff has the following severe combination of impairments best described as: cognitive

impairment; post-traumatic stress disorder; and anxiety. (*Id.*) The ALJ found that Plaintiff did

not have an impairment or combination of impairments that meets or medically equals the

severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

At step four of the sequential process, the ALJ set forth Plaintiff's residual functional

capacity ("RFC") as follows:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform a full range of work at all
> exertional levels, but with the following nonexertional limitations: He should avoid
> all exposure to unprotected heights and all use of dangerous machinery. He can
> perform simple routine tasks. He can perform goal-oriented work, but no constant
> production-rate pace work, such as on an automated assembly line and no strict
> hourly quotas. He is limited to jobs in which changes occur no more than
> approximately 10 percent of the workday. He can interact with the public no more
> than approximately 10 percent of the workday, but can have no transactional
> interaction, such as sales or negotiations. He can have only occasional interaction
> with coworkers and supervisors[.]

(R. at 86.) The ALJ found that Plaintiff's "medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements

concerning the intensity, persistence and limiting effects of these symptoms are not entirely

consistent with the medical evidence and other evidence in the record." (R. at 87.) Specifically,

the ALJ noted that Plaintiff's "statements about the intensity, persistence, and limiting effects of

his symptoms . . . are somewhat inconsistent with the medical evidence." (*Id.*) In support, the

---

5.      Considering the claimant's age, education, past work experience, and residual
            functional capacity, can the claimant perform other work available in the national
            economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster
v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

ALJ highlighted that Plaintiff "benefitted" from psychotropic medication, including Lexapro, and that he made "progress" with specialized mental health treatment in the form of counseling/psychotherapy at Hopewell Health Center from late 2016 through early 2018. (*Id.*) The ALJ concluded that "such limited treatment, especially when considered in conjunction with [Plaintiff's] positive responses to psychotropic drugs, does not adequately substantiate the claimant's allegations that he could not follow directions well enough or get along well enough with others to work." (*Id.*) The ALJ also noted that Plaintiff "consistently exhibited psychological clinical signs," which were "contrary to his allegations of debilitating mental impairments" but "[i]n keeping with his reported improvement from psychotropic medications." (*Id.*)

The ALJ found that "the record establishes the severity of [Plaintiff's] cognitive impairment," but concluded that "the record does not illustrate that [Plaintiff's] cognitive impairment would prevent him from working." (R. at 87-88.) The ALJ found that Plaintiff's poor academic performance were impacted by "[o]ther considerations," including rushing through work and not studying, and although he was placed in special education classes, Plaintiff "earned decent grades in this setting and ultimately graduated from high school." (R. at 88.) The ALJ also contrasted Plaintiff's reported struggle to follow instructions in recent work attempts with Plaintiff's daily activities, as well as his ability to mow grass, which the ALJ found "demonstrate that he [can] perform simple, routine tasks when considered along with objective evidence, such as examination findings during office visits." (*Id.*)

The ALJ also found that Plaintiff's "activities portray [Plaintiff] as capable of working." (*Id.*) The ALJ highlighted Plaintiff's experience mowing grass during the summer of 2016, his participation in a job-placement program for individuals with learning disabilities, and his

volunteer work with a fire department, which the ALJ found "suggests that he remains capable of interacting with others."  (*Id.*)  The ALJ concluded that "[a]lthough he has not sustained a job, [Plaintiff] has performed recent work activity, which suggests that he could work more consistently under the right conditions," and that one recent job "did not end because of [Plaintiff's] work performance."  (*Id.*)  Nevertheless, the ALJ concluded that "the demonstrable limiting effects of [Plaintiff's] impairments still warrant some limitations."  (*Id.*)  Specifically, the ALJ restricted the kind of work that Plaintiff can perform, "to accommodate the limitations caused by [Plaintiff's] psychological limitations," and the ALJ also imposed environmental restrictions "to safeguard [Plaintiff] from side effects of psychotropic medications."  (*Id.*)

The ALJ considered the opinions provided by State Agency psychological consultants, as well as by Dr. Rhodes, but she only afforded those opinions "some weight."  (*Id.*)  The ALJ also considered a third-party function report and narrative correspondence, as well as the testimony of Plaintiff's father, affording them "little weight" and "limited weight," respectively.  (*Id.*)

Relying on testimony from the VE, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, he can perform jobs that exist in significant numbers in the national economy, including packager, laundry laborer, sorter, assembler, routing clerk, marking clerk, and inspector.  (R. at 90-91.)  She therefore concluded that Plaintiff was not disabled under the Social Security Act.  (*Id.*)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.  ANALYSIS

Plaintiff puts forth one assignment of error:  that the ALJ did not properly take into consideration all of the opined limitations.  (ECF No. 10 at PAGEID ## 620-624.)  Plaintiff argues that when construing Plaintiff's RFC, the ALJ "completely failed to address certain limitations," and that "[t]he ALJ failed to provide valid reasoning, supported by substantial

17

evidence explaining why [s]he discredited certain opinions and why [s]he completely omitted others." (*Id.* at PAGEID ## 620-621.) Plaintiff believes "the ALJ's utter lack of explanation regarding how [s]he constructed the residual functional capacity . . . leaves this decision unreviewable." (*Id.* at PAGEID # 624.) Specifically, Plaintiff's argument focuses on the ALJ's treatment of the State Agency consultants, Drs. Tangerman and Voynten.

As a preliminary matter, the determination of a claimant's RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:08-cv-411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). An ALJ must explain how the evidence supports the limitations that he or she sets forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at *7 (internal footnote omitted).

In addition, the ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive."). The applicable regulations define medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1); *see also* SSR 96–8p, 1996 WL 374184, *7 (July 2, 1996) ("The RFC assessment must always

consider and address medical source opinions.").  Like other medical source opinions, the ALJ must consider state agency medical opinions.  *See* 20 C.F.R. § 416.913a(b)(1) ("Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 416.920b, 416.920c, and 416.927, as appropriate, because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."); SSR 96-6p, 1996 WL 374180, *2 (July 2, 1996) (administrative law judges are required to consider state agency medical "findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists. Administrative law judges and Appeals Council are not bound by findings made by State agency . . . but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.").

Regardless of the source of a medical opinion, in weighing the opinion, the ALJ must apply the factors set forth in 20 C.F.R. § 416.927(c), including the examining and treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the source.  "In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."  SSR 96-6p, 1996 WL 374180, *3; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (state-agency medical consultants are "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act"; thus, in some cases, "an ALJ may assign greater weight to a state agency consultant's opinion than to that of a treating or examining source." (first alteration in original) (internal quotation marks omitted)); *Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 415 (6th Cir. 2004) ("State agency

19

medical consultants are considered experts and their opinions may be entitled to greater weight if their opinions are supported by the evidence.").

Here, as the Commissioner correctly observes, none of Plaintiff's treatment providers issued a medical opinion regarding Plaintiff's condition.  (ECF No. 15 at PAGEID # 634.) Accordingly, there are only three medical opinions in the record:  (1) the Disability Examination report by Dr. Amynda Rhodes; (2) the Disability Determination Explanation at the Initial level, by Dr. Paul Tangerman; and (3) the Disability Determination Explanation at the Reconsideration level, by Dr. Karla Voynten.  Because none of these opinions came from a treating physician, the ALJ had "substantial latitude in weight the other medical evidence and resolving conflicts in that evidence."  *Smith v. Comm'r of Soc. Sec.*, No. 2:13-CV-582, 2014 WL 1764663, at *7 (S.D. Ohio May 1, 2014), *report and recommendation adopted sub nom. Smith v. Colvin*, No. 2:13-CV-582, 2014 WL 2197940 (S.D. Ohio May 27, 2014) ("When there is no treating physician opinion in the record, the ALJ is generally given substantial latitude in weighing the other medical evidence and resolving conflicts in that evidence.").  Plaintiff does not appear, however, to take any issue with how the ALJ considered Dr. Rhodes' opinion.  (*See* ECF Nos. 10, 16.)  Accordingly, the Court's analysis is limited to the ALJ's treatment of Drs. Tangerman and Voynten's opinions.

Drs. Tangerman and Voynten are State Agency consultants.  An ALJ "must explain in the decision the weight given the opinions of a State Agency medical '. . . consultant[,]" 20 C.F.R. § 404.2527(e)(2)(ii), but need not give "an exhaustive factor-by-factor analysis" of her decision. *Cf. Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (citations omitted). Although "an opinion from a medical source who has examined a claimant is [generally] given more weight than that from a source who has not performed an examination," ALJs have more discretion in considering non-treating source opinions.  *Gayheart v. Comm'r of Soc. Sec.,* 710

F.3d 365, 375 (6th Cir. 2013). ALJs are not required to give "good reasons" for discounting non-treating source opinions. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016).

Plaintiff argues that "the ALJ failed to acknowledge, examine, and explain the entirety of the opinions that were provided by the state agency psychologists." (ECF No. 10 at PAGEID # 621.) Plaintiff notes that Drs. Tangerman and Voynten "provided a number of mental health limitations restricting [Plaintiff's] ability to function," and observes that "[a] quick comparison between the ALJ's residual functional capacity and the state agency psychologists' opinions reveals several discrepancies." (*Id.* at PAGEID ## 623.) As the Commissioner correctly notes, however, this argument misapprehends the appropriate standard. (ECF No. 15 at PAGEID # 634.) "[T]here is no regulatory requirement that an ALJ adopt every facet of a particular medical opinion in formulating an RFC, so long as the record as a whole supports the RFC actually determined by the ALJ, and she adequately explains her analysis in a manner sufficient to allow review." *Kincaid v. Comm'r of Soc. Sec.*, No. 1:16-CV-736, 2017 WL 9515966, at *3 (S.D. Ohio June 12, 2017), *report and recommendation adopted*, No. 1:16CV736, 2017 WL 4334194 (S.D. Ohio Sept. 30, 2017). A disagreement with how the ALJ decided to weigh differing medical opinions "is clearly not a basis for . . . setting aside the ALJ's factual findings." *Id.* (citing *Mullins v. Sec'y of Health & Hum. Servs.*, 836 F.2d 980, 984 (6th Cir. 1987)). Further, "there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (citations omitted).

The Court finds that the ALJ adequately explained her analysis in a manner sufficient to allow review, and that substantial evidence supports the ALJ's RFC finding. Despite Plaintiff's

charge that "the ALJ completely failed to address certain limitations," the ALJ in fact addressed **all** of the critical limitations identified by Plaintiff.  (*Compare* R. at 88 (ALJ's Decision) ("They concluded that [Plaintiff] could understand[,] remember and carry out very simple, routine and repetitive tasks that do not require working in groups or high production demands, could have occasional and superficial interaction in the work setting and could adjust to minor and infrequent changes in the work setting, all with supervisory support.") *with* ECF No. 10 at PAGEID # 624 (Plaintiff's Statement of Errors) ("Both at the initial and reconsideration level, the state agency psychologists reviewing Mr. Welsh's case noted that his limitations included being able to understand and carry out simple instructions, a need for supervisory support, ability to partake in simple and repetitive tasks, not being able to work in groups or with high production demands, possess occasional and superficial workplace interactions, and having the ability adjust to minor and infrequent changes in the work setting.").)

Plaintiff's claims that the ALJ "never accounted for the state agency psychologists' opinion that [Plaintiff] would need work that is repetitive in nature," that the RFC "does not account for [Plaintiff's] inability to work in groups," and that the RFC "makes no mention of [Plaintiff's] need for additional supervisor support," are similarly not well taken.  (ECF No. 10 at PAGEID # 624.)[3]  First, the ALJ's RFC does account for work that is repetitive in nature, by

---

[3] In Plaintiff's Reply brief, Plaintiff sets forth the purported "three main inconsistencies" in a slightly different way:

> After comparing the state agency opinions and the residual functional capacity, there are three main inconsistencies that remain. First, the state agency opined that Mr. Welsh would need some supervisory support. *PageID No*. 192. Second, the state agency opined that Mr. Welsh was not able to work in groups. *Id*. Third, the state agency opined that Mr. Welsh could only engage in superficial interaction. *Id*. The residual functional capacity does not account for any of these limitations.

(ECF No. 16 at PAGEID # 651.)  At first glance, it is unclear to the Court whether Plaintiff abandoned his argument that the RFC "never accounted for the state agency psychologists'

noting that Plaintiff "can perform goal-oriented work, but no constant production-rate pace work, **such as on an automated assembly line** and no strict hourly quotas" and "[h]e is limited to jobs in which changes occur no more than approximately 10 percent of the workday." (R. at 86 (emphasis added).)[4] Second, the ALJ's RFC also accounts for Plaintiff's inability to work in groups, stating Plaintiff "can have only occasional interaction with coworkers and supervisors." (R. at 86.) Finally, Plaintiff's argument that the RFC "makes no mention of [Plaintiff's] need for additional supervisor support" technically is an accurate statement, but it is a red herring. As the Commissioner correctly notes, Drs. Tangerman and Voynten merely reported Plaintiff's need for "*some* supervisor support," not "*additional* supervisor support" as Plaintiff claims.[5] (ECF No.

---

opinion that [Plaintiff] would need work that is repetitive in nature," since Plaintiff does not address this argument at all in his Reply. (*Compare* ECF No. 10 at PAGEID # 624 *with* ECF No. 16.) Regardless, to the extent Plaintiff now argues that the RFC does not account for the limitation that Plaintiff "could **only engage in superficial interaction**," that is not an accurate representation of the State Agency consultants' opinions. (R. at 143, 154 (Stating Plaintiff "does retain the capacity **for occ[asional] and superficial interaction** in the work setting.") (emphasis added).) Because this argument was only raised for the first time in Reply, the Court considers the argument to have been waived by Plaintiff. *Carroll v. Comm'r of Soc. Sec.*, No. 2:17-CV-387, 2018 WL 2138467, at *5 n.3 (S.D. Ohio May 9, 2018), *report and recommendation adopted*, No. 2:17-CV-387, 2018 WL 2432881 (S.D. Ohio May 30, 2018) (citations omitted); *Anton v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 634 F.3d 364, 368 n.2 (6th Cir. 2011) (declining to consider arguments raised for the first time in a reply brief); *see also Post v. Comm'r of Soc. Sec.*, No. 2:15-CV-2110, 2016 WL 1745054, at *5 (S.D. Ohio May 3, 2016), *report and recommendation adopted*, No. 2:15-CV-2110, 2016 WL 3002427 (S.D. Ohio May 23, 2016) ("It is not appropriate for a new argument to be raised for the first time in a reply memorandum."). This Court will only review the arguments raised in Plaintiff's Statement of Errors, ECF No. 10.

[4] Regardless, as the Commissioner correctly notes, "any error the ALJ might have made [b]y not including the word 'repetitive' in the RFC was harmless," because all of the jobs that were identified by the VE were unskilled jobs, which Courts routinely find to be inherently simple, routine, and repetitive tasks. (ECF No. 15 at PAGEID ## 641-642 (citations omitted).) As referenced above, Plaintiff did not respond to the Commissioner's argument on this point in his Reply brief. (*See* ECF No. 16.)

[5] Plaintiff also appears to have conceded this point, as his Reply brief does not mention Plaintiff's purported need for "additional" supervisory support at all. (*See generally* ECF No. 16.)

15 at 11 n.7 (citing R. at 143, 154) (emphasis added).)  The ALJ's RFC expressly accounts for

this need, expressly providing for interaction (albeit limited) with supervisors.  (R. at 86.)

Even assuming, *arguendo*, that Plaintiff's descriptions of the ALJ's RFC were accurate,

the ALJ nevertheless adequately explained her RFC analysis in a manner sufficient to allow

review, and the ALJ's decision is supported by substantial evidence.  This is especially true

given that the ALJ's decision expressly discusses, and incorporates, evidence that was submitted

***after*** Drs. Tangerman and Voynten provided their opinions.  Specifically, the ALJ cited nearly

200 pages of record evidence that Drs. Tangerman and Voynten did not review, in addition to the

testimony at the administrative hearing.  (R. at 88.)  As the ALJ explained, these records (which

Drs. Tangerman and Voynten did not review) "portray [Plaintiff] as capable of working," citing

Plaintiff's summer job mowing grass and his volunteer work with the fire department.  (*Id.*)  The

ALJ found that "[a]lthough he has not sustained a job, [Plaintiff] has performed recent work

activity, which suggests that he could work more consistently under the right conditions.  In fact,

[Plaintiff] ended one recent job because his employer wanted him to obtain a commercial

driver's license.  It did not end because of [Plaintiff's] work performance."  (*Id.*)  Thus, Plaintiff

incorrectly suggests that "the ALJ never explains how any of those activities demonstrates an

ability to work with others in a group," as the ALJ cited evidence showing Plaintiff's ability to

succeed in a group under the right conditions.  (ECF No. 16 at PAGEID # 652.)  Mr. Welsh

himself echoed this sentiment at the administrative hearing, testifying that he thought Plaintiff's

most recent job "was a good fit for him" and that "if it hadn't been for the [driver's license]

thing, I think he could have succeeded."  (R. at 122.)  Accordingly, the Undersigned rejects

Plaintiff's charges that "the ALJ's decision is nothing more than a strategic ploy allowing the

ALJ to construct the [RFC] free of any influence of the state agency psychologists, whose

opinions may not conform" and that "[t]he Commissioner's position here is entirely *post hoc* rationalization."  (ECF No. 10 at PAGEID # 623; ECF No. 16 at PAGEID # 652.)

To be clear, an ALJ is not required to mirror or parrot medical opinions verbatim, especially when provided with additional evidence.  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  And where, as here, an ALJ has accorded an opinion only "some weight," the ALJ need not include all of the limitations in the RFC or even discuss why certain limitations have been omitted.  While Plaintiff may have preferred a different RFC than the one determined by the ALJ, the ALJ thoroughly explained the bases for the RFC determination as it relates to Drs. Tangerman and Voynten's proposed limitations and this explanation enjoys substantial support in the record.  *Dickinson v. Comm'r of Soc. Sec.*, No. 2:19-CV-3670, 2020 WL 4333296, at *11 (S.D. Ohio July 28, 2020), *report and recommendation adopted*, No. 2:19-CV-3670, 2020 WL 5016823 (S.D. Ohio Aug. 25, 2020) (citing *Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x 637, 649 (6th Cir. 2013); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) ("The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.")).  Under these circumstances, the Undersigned finds no merit to Plaintiff's statement of error.

For these reasons, it is **RECOMMENDED** that Plaintiff's first contention of error be **OVERRULED**, and the Commissioner's decision be **AFFIRMED**.

## VII.  CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Based on the foregoing, it is therefore **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: December 17, 2020          */s/ Elizabeth A. Preston Deavers*
                                  **ELIZABETH A. PRESTON DEAVERS**
                                  **CHIEF UNITED STATES MAGISTRATE JUDGE**